807 A.2d 1131

**MARYLAND STATE HIGHWAY ADMINISTRATION,**

v.

**ENGINEERING MANAGEMENT SERVICES,
INC., d/b/a EMS, Inc.**

**No. 1410, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Sept. 25, 2002.

William A. Kahn, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Laurie A. Lyte, Asst. Atty. Gen., on the brief), Baltimore, for appellant.

Philip M. Andrews (Max H. Lauten and Kramon & Graham, P.A., on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and JOHN J. BISHOP (Rct., specially assigned), JAMES S. GETTY (Ret., specially assigned) JJ.

JOHN J. BISHOP, Judge, Retired, Specially Assigned.

This appeal arises from a dispute between Engineering Management Services, Inc., Appellee ("EMS"), and the Maryland State Highway Administration, Appellant ("SHA"), over a contract for the removal of lead paint and the repainting of five bridges. In March 1993, Appellant, SHA, requested bids for the removal of lead-based paint and the repainting of 5 bridges over I–95 in Baltimore and Howard Counties. Appellee, EMS, submitted a bid. By letter dated April 13, 1993, EMS was notified that it was the successful bidder.

The contract required EMS to comply with the Environmental Protection Agency ("EPA") National Ambient Air Quality Standards, 40 C.F.R. Part 50, which establishes a general permissible exposure limit for particulate matter of 150 micrograms per cubic meter. The contract further required EMS to comply with "all Federal, State, and local laws, regulations and ordinances applicable to its activities and obligations under this contract." Specifically, the contract

subjected EMS to 29 C.F.R. § 1926, which contains the Federal Occupational Safety and Health Administration ("OSHA") regulations "as revised from time to time."

On May 4, 1993, twenty-one days after EMS accepted SHA's bid, OSHA issued new regulations, titled "Lead Exposure in Construction," imposing more stringent standards regarding exposure of workers to lead. The new regulations were published in the Federal Register one month after the acceptance of the bid with an effective date of June 3, 1993. 58 Fed.Reg. 26, 627 (May 4 1993). Before the promulgation of the new regulations, OSHA regulations for lead exposure did not apply to construction workers. The new regulations, which were applicable to construction workers, imposed a maximum permissible exposure limit for lead of 50 micrograms per cubic meter, and also required special precautions such as protective clothing and equipment and special hygiene facilities and practices. (Since 1984, the Maryland Occupational Safety and Health Administration (MOSHA) has issued regulations that apply to construction workers exposed to lead. See COMAR 09.12.32. These regulations provide for a permissible exposure to lead of 50 micrograms per cubic meter, the same standard adopted by OSHA in 1993. When the OSHA regulations came into effect, they superseded the MOSHA regulations).

On May 21, 1993, SHA issued a formal Notice of Award to EMS and a Notice to Proceed was issued on July 26, 1993. EMS did not begin performance on the contract until September 30, 1993.

On April 22, 1994, approximately one year after the effective date of the revised regulations, EMS's Vice President and Project Manager, David Aulakh, wrote a letter to SHA in which he made the following request:

With reference to the change in OSHA standard for compliance with National Ambient Air Quality Standard, kindly advise us which standard we should follow for this project. Do we use the standard as stated in the specification which is 150 $\mu$ g/m$^3$ over a 24 hour time period or the new OSHA

standard which was adopted late last year and states that [sic] 50 μg/m³ over a 24 hour time period?

By letter dated April 27, 1994, SHA's District Engineer, Douglas R. Rose, advised EMS:

The Permissible Exposure Limit (PEL) in accordance with the Occupational Exposure to Lead in Construction Work, COMAR 09.12–32, is 50 micrograms/cubic meter (50 Sg/m³) averaged over an 8 hour period, adopted November 28, 1988.

The National Ambient Air Quality Standards according to 40 CFR Part 50 is 150 μg/m³ over a 24 hour [sic]. The Department of Labor Occupational Safety and Health Administration, 29 CFR Part 1926, dated May 4, 1993, reduced the permitted level of exposure to lead for construction workers from 200 μg/m³ as an 8–hour time weighted average (TWA) to an 8–hour TWA of 50 μg/m³.

Sometimes there will be conflict between two provisions. The more specific and most stringent specification should govern over the less strict provision. The contract Special Provisions, pages 110 and 111 do chart the compliance levels for Permissible Exposure Limits.

On May 2, 1994, Aulakh advised SHA that EMS was

unable to continue working on the above referenced project because we are presently [sic] for the results of tests we have taken to evaluate compliance with OSHA regulations. As soon as we receive these results we will be able to evaluate our engineering controls and adjust accordingly. This process will take a few days.

More than ten months later, on March 6, 1995, EMS wrote to SHA requesting an 180–day extension on the contract due to "the increased loss of productivity resulting from new Health and Safety Regulations that have been enacted after the start of this contract." Aulakh explained that "[t]he current production rate under these new conditions is approximately 550 square feet per day. Previously our rate was approximately 1,500 square feet per day. This 64% decrease

has greatly impacted our schedule and is the basis for our extension request."

On March 23, 1995, SHA replied to EMS, taking issue with the complaints raised in EMS' letter of March 6, 1995. SHA denied EMS' request for a 180–day extension on the project, but agreed to a shorter extension.

On June 13, 1995, Aulakh again wrote to SHA requesting $1,244,564 in additional compensation due to changes in the Lead Exposure Regulations codified at 29 CFR 1926.62. The parties met to discuss a possible resolution to their conflict, but no final agreement was reached.

EMS later requested additional compensation in the amount of $2,377,341, but subsequently reduced its request to $764,036. By letter dated June 28, 1999, SHA denied EMS's claim for additional compensation and a time extension.

EMS filed a timely appeal to the Maryland State Board of Contract Appeals ("the Board") seeking the time extension and an equitable adjustment to the contract in the amount of $764,036. SHA moved for summary disposition of the appeal on the grounds that EMS failed to file a timely notice of claim. The Board agreed with SHA and dismissed the appeal, ruling, in part, as follows:

Applying the provisions relating to timely filing of a claim as set forth in COMAR and the general provisions of the Contract, a notice of claim was required to be filed within thirty (30) days after the basis for the claim was known or should have been known. For EMS' claim relating to additional costs allegedly resulting from new OSHA regulations to be timely, a notice of claim arguably should have been filed no later than 30 days after the OSHA regulations became effective on June 3, 1993 and certainly within 30 days of the completion of [EMS'] cost evaluation of the effect of compliance in May, 1994. We recognize that cost quantification or documentation may not have been possible on the day the new regulations took effect or were held to be applicable to [EMS'] Contract and would have been dependent on any actual additional costs related to compli-

ance with the new regulations incurred during performance. However, EMS did not file its notice of claim until March 6, 1995. The notice of claim reflects EMS' awareness that the new regulations were having an alleged cost impact on its performance of the Contract for more than thirty days prior to March 6, 1995. The Board may not consider a claim for which notice is late. Accordingly, the Motion for Summary Disposition is granted and the appeal is dismissed with prejudice.

EMS filed a petition for judicial review in the Circuit Court for Baltimore City. The circuit court issued a memorandum opinion reversing the Board's decision. The court determined that the Board erred in its summary disposition of EMS' appeal because there are no rules or regulations regarding the standards to be applied in such a proceeding. The court further determined that the time limit for filing claims with SHA, that is, "30 days after the basis for the claim is known or should have been known," is a subjective measurement. According to the court, a determination of whether EMS' measurement of the increased costs associated with the new OSHA standards was completed in a timely fashion required a factual determination that is "not amenable to summary disposition imposing a [Board] interpretation, without a fair hearing of both sides of the timeliness dispute."

This appeal followed. The sole issue presented for our consideration is whether the Board properly granted summary disposition against EMS for failure to file a timely written notice of claim.

## SCOPE OF REVIEW

In reviewing a decision of an administrative agency, we distinguish between the agency's findings of fact, to which great deference is due under the clearly erroneous standard, and the agency's rulings of law, for which courts do not hesitate to substitute their judgment for that of the agency. Our review of the agency's findings of fact is limited to determining whether there is substantial evidence in the ad-

ministrative record as a whole to support the agency's findings and conclusions. The test is a deferential one which requires restrained and disciplined judicial judgment. We may not substitute our judgment for that of the agency or interfere with the agency's factual conclusions. *Young v. Bd. of Physician Quality Assurance,* 111 Md.App. 721, 725–27, 684 A.2d 17 (1996), *cert. dismissed,* 346 Md. 314, 697 A.2d 82 (1997). We owe no deference to agency conclusions based upon errors of law, to which the substituted judgment standard applies. *State Ethics v. Antonetti,* 365 Md. 428, 447, 780 A.2d 1154 (2001); *Dep't of Health & Mental Hygiene v. Reeders Mem. Home, Inc.,* 86 Md.App. 447, 452–53, 586 A.2d 1295 (1991).

## DISCUSSION

■ Appellant contends that the Board was authorized to grant summary disposition to EMS' claim and that it acted in accordance with that authority. EMS contends, *inter alia,* that the "undefined, unwritten 'summary disposition' procedure" utilized by the Board was not authorized by statute or regulation and violates due process. EMS further contends that, even if the summary disposition procedure was authorized, the Board improperly granted summary disposition because the issue of whether timely notice of the claim was given to SHA involved a factual dispute as to when EMS knew or should have known of the basis for its claim. We agree with Appellant that the Board was authorized to grant summary disposition and that it acted properly in summarily disposing of EMS' claim.

The Board was created by statute as an independent unit of the Executive Branch of the State government. Md.Code Ann., State Fin. & Proc. § 15–206. (Unless noted otherwise, all references to the Maryland Annotated Code and COMAR are to the versions that were in effect in 1993.) Pursuant to statute, the Board, in accordance with Title 10, Subtitle 1 of the State Government article, is required to adopt regulations that provide for informal, expeditious, and inexpensive resolution of appeals. Md.Code Ann. State Fin. & Proc., § 15–210.

State Finance and Procurement article, Section 15–216(b), provides that the Board "shall conduct proceedings in accordance with Title 10, Subtitle 2 of the State Government Article," which governs contested cases subject to the Administrative Procedure Act. Section 10–210 specifically provides that, unless otherwise precluded by law, an agency or the Office of Administrative Hearings may dispose of a contested case by, *inter alia,* summary disposition.

■ It is undisputed that the Board did not adopt regulations which provide the procedural details of a summary disposition proceeding. There is, however, no statutory requirement that the Board provide specific summary disposition standards in its procedural regulations. SHA argues that it was within the discretion of the Board to proceed either by regulation or by decisional rule in determining the procedural details of a summary disposition proceeding. EMS argues that because no standard was adopted for summary disposition, the Board could not resolve this case by summary disposition.

In *Stifler v. Weiner,* 62 Md.App. 19, 488 A.2d 192 (1985), we addressed the issue of whether the panel chairman, in a case before the Health Claims Arbitration Office, was authorized to summarily dispose of a case that was barred by the applicable statute of limitations. We wrote:

> Although there is no provision in the statute for summary disposition (*compare* Md. Rule 2–501), we see no reason why a claim cannot be adjudicated on that basis in those instances where it may be susceptible to such treatment. If, for example, as here, limitations has clearly run on the claim, there is no reason to waste time, effort, and money on a full-scale trial on the merits of the claim.

*Stifler,* 62 Md.App. at 25, 488 A.2d 192. See also *Quesenberry v. Washington Suburban Sanitary Comm'n,* 311 Md. 417, 425, 535 A.2d 481 (1988)("we do not suggest that administrative bodies performing quasi-judicial functions may not avail themselves of summary dispositions when the relevant adjudicative facts are not in dispute.").

■ In the case sub judice, while there is no regulation with regard to the procedural aspects of summary disposition, the Board used a recognized and appropriate standard identical to Md. Rule 2–501, Motion For Summary Judgment. *Delmarva Power & Light Co. d/b/a Connectiv Power Delivery v. Public Service Comm'n of Md.*, 370 Md. 1, 803 A.2d 460 (2002); *Maryland Ass'n of Health Maintenance Organizations v. Health Services Cost Review Comm'n*, 356 Md. 581, 600, 741 A.2d 483 (1999)(agency has some measure of freedom to develop and apply standards that interpret or implement statutes that they administer through adjudication rather than regulation). See also *Patchogue Nursing Center v. Bowen*, 797 F.2d 1137, 1143 (2d Cir.1986)(as long as agency proceeds in accordance with "ascertainable standards" and provides statement of reasoning when applying the standards, court need not require formal rulemaking). Specifically, the Board looked to whether there was a genuine dispute as to any material fact and whether the moving party was entitled to judgment as a matter of law. It is undisputed that the Board has consistently applied this standard in other cases involving summary disposition. While the better practice may be to provide the summary disposition procedure in a regulation, the parties here were aware of the long-applied standard used by the Board.

■ Having said that, EMS failed to raise this issue before the Board. Judicial review of administrative decisions is limited to the issues raised before the agency. *Mayor and Council of Rockville v. Woodmont Country Club*, 348 Md. 572, 582 n. 3, 705 A.2d 301 (1998)(citing *Insurance Comm'r of the State of Maryland v. Equitable Life As. Soc. of the United States*, 339 Md. 596, 634, 664 A.2d 862 (1995)). While we need not reach this issue, we will address it because it impacts upon our consideration of whether summary disposition was appropriately granted by the Board in favor of SHA. EMS argues that even if the summary disposition procedure was authorized, it was improperly granted because there was a factual dispute as to when EMS knew or should have known of the

basis for its claim. According to EMS, a factual dispute was raised by the affidavit testimony of David Aulakh.

The undisputed facts are: The new OSHA regulations were published in the Federal Register on May 4, 1993 and had an effective date of June 3, 1993. The contract obligated EMS to comply with OSHA regulations. EMS did not begin performance under the contract until September 30, 1993. By letter dated April 27, 1994, SHA informed EMS that the more stringent OSHA standards governed the contract. Finally, by letter dated May 2, 1994, EMS informed SHA that it would complete its evaluation of compliance with the new OSHA regulations "in a few days." Pursuant to General Provision 5.14 of the contract and COMAR 21.10.04.02, EMS was required to file a written notice of claim relating to the contract within 30 days after the basis for the claim is known or should have been known, whichever is earlier.

Aulakh submitted the following affidavit testimony in support of EMS' opposition to SHA's motion for summary disposition:

3. Because of logistical difficulties, EMS was unable to begin its Project work on site until the end of September, 1993. By agreement with SHA, temporary suspension of work because of winter weather conditions lasted from the end of November, 1993 until the end of March, 1994. That work suspension was extended, by agreement, to the end of April, 1994.

4. During all times pertinent to the above-captioned appeal, EMS' fiscal year ended on April 30. Although the two months' of limited work on site during calendar year 1993 pointed up the need for additional time to complete the contract, and resulted in EMS putting SHA on notice by January 13, 1994 of the need for a contract extension, EMS' request to SHA for additional compensation could not be accurately and reliably quantified until the close of EMS' fiscal year on April 30, 1995, when the financial results of work over a fiscally significant period of time were available. By the end of May, EMS' accountants had provided such

financial results to EMS. That information was used to prepare of [sic] EMS' June 13, 1995 letter to Gene R. Straub, SHA District Engineer, on June 13, 1995 seeking additional compensation.

Did Aulakh's affidavit generate a genuine dispute of a material fact whether a notice of claim was timely filed?

The required elements for a notice of claim are provided in the State Finance and Procurement article of the Annotated Code, COMAR, and General Provision 4.06 of the contract. Section 15–217(b) of the State Finance and Procurement article requires that "[a] protest or contract claim shall be submitted within the time required under regulations adopted by the primary procurement unit responsible for the procurement." Md.Code Ann. State Fin. & Proc. § 15–217(b). Md.Code Ann. State Fin. and Proc. § 15–219(a) provides:

(a) *Explanation of claim.*—Within 30 days after submitting a notice of a contract claim under a procurement contract for construction, a contractor shall submit to the unit a written explanation that states:

(1) the amount of the contract claim;

(2) the facts on which the contract claim is based; and

(3) all relevant data and correspondence that may substantiate the contract claim.

COMAR 21.07.02.02 governs mandatory contract clauses and includes a provision for changes. It provides that a notice of claim is required to state only the basis of the claim, specifically "the date, circumstances, and source of the order and that the Contractor regards the order as a change order." COMAR 21.07.02.02(2). The cost incurred as a result of the change is not required until an explanation of claim is filed. The filing of claims is regulated by COMAR 21.10.04.02, which provides:

A. Unless a lesser period is prescribed by law or by contract, a contractor shall file a written notice of a claim relating to a contract with the appropriate procurement officer within 30 days after the basis for the claim is known or should have been known, whichever is earlier.

B. Contemporaneously with or within 30 days of the filing of a notice of claim, but no later than the date that final payment is made, a contractor shall submit the claim to the appropriate procurement officer. The claim shall be in writing and shall contain:

(1) An explanation of the claim, including reference to all contract provisions upon which it is based;

(2) The amount of the claim;

(3) The facts upon which the claim is based;

(4) All pertinent data and correspondence that the contractor relies upon to substantiate the claim; and

\* \* \*

C. A notice of claim or a claim that is not filed within the time prescribed in Regulation .02 shall be dismissed.

D. Each procurement contract shall provide notice of the time requirements of this regulation.

General provision 5.14(d) of the contract provides that "the Contractor shall file written notice of claim for extension of time, equitable adjustment, extra compensation, damages, or any other matter (whether under or relating to this Contract) with the procurement officer within 30 days after the basis for the claim is known or should have been known, whichever is earlier."

General Provision 4.06 of the contract contains provisions relating to contract changes. It provides, in part:

B. Any other written order or oral order including a direction, instruction, interpretation or determination from the procurement officer that causes any such change, shall be treated as a change order under this clause, provided that the Contractor gives the procurement officer written notice stating the date, circumstances, and source of the order and that the Contractor regards the order as a change order.

* * *

E. If the Contractor intends to assert a claim for an equitable adjustment under this clause, he shall, within 30 days after receipt of a written change order under A. above or the furnishing of written notice under B. above, submit to the procurement officer a written statement setting forth the general nature and monetary extent of such claim, unless this period is extended by the State. The statement of claim hereunder may be included in the notice under B. above.

These statutory provisions, regulations, and contract terms do not require that the notice of claim contain the precise amount of the claim. EMS was required to provide the State with the date, circumstances, and source of the order or other event that gave rise to its claim, and a statement that EMS regarded the new OSHA regulations as a change to the contract. The amount was not required for the initial notice of claim but was reserved for the subsequent explanation.

Aulakh's affidavit addressed only the amount of the claim and when that amount became known. It did not address when EMS became aware that the new OSHA regulations would affect its contract performance. As a result, the affidavit failed to raise a genuine issue as to when EMS knew or should have known of the basis for its claim.

The January 12, 1994 letter from EMS did not serve as notice of a claim resulting from the new OSHA regulations and the potential impact of those regulations on EMS' work. In that letter, EMS requested a time extension because of difficulties experienced in securing appropriate equipment. The letter did not mention the new OSHA regulations or their potential impact on the work required under the contract.

The Board acted properly when it granted summary disposition and found that EMS was barred from any equitable adjustment because the notice of claim should have been filed within 30 days after the OSHA regulations became effective on June 3, 1993 and, certainly, within 30 days of EMS' completion of a cost evaluation of the effect of compliance, in

May 1994. The failure of EMS to file a notice of claim within the required time limit was sufficient basis for the summary disposition.

■ EMS argues that it was denied due process in the proceedings before the Board. Due process required that EMS have notice and an opportunity to be heard on the issues to be decided in the case. *Roberts v. Total Health Care, Inc.,* 349 Md. 499, 500–11, 709 A.2d 142 (1998); *Blue Cross of Maryland, Inc. v. Franklin Square Hospital,* 277 Md. 93, 101, 352 A.2d 798 (1976)(and cases cited therein). EMS submitted a written brief and a supporting affidavit which were considered along with oral argument opposing the grant of summary disposition. These satisfied due process.

■ EMS also argues that the timely notice requirement applies only to its submission to the SHA and does not affect subsequent proceedings before the Board. Where a statute or regulation provides for dismissal for failure to act within a prescribed time, timely action is a pre-condition to any further proceedings and failure to comply dictates dismissal. *Robinson v. Pleet,* 76 Md.App. 173, 182–83, 544 A.2d 1 (1988). Such is the case here. Section 15–217(b) of the State Finance and Procurement article requires that a contract claim "**shall** be submitted within the time required under regulations adopted by the primary procurement unit responsible for the procurement." COMAR 21.10.04.02.A requires that "a contractor **shall** file a written notice of a claim relating to a contract with the appropriate procurement officer within 30 days after the basis for the claim is known or should have been known, whichever is earlier." COMAR 21.10.04.02.C further mandates that a notice of claim "that is not filed within the time prescribed in Regulation .02 of this chapter **shall** be dismissed." (Emphasis supplied) The word "shall" in a statute is presumed mandatory on the parties and, unless context indicates otherwise, "shall" and "must" will be construed synonymously "to foreclose discretion" and "impose a positive absolute duty." *Tranen v. Aziz,* 59 Md.App. 528, 534–35, 476 A.2d 1170 (1984). Because timely filing of the written notice is

mandatory, the Board had no discretion to allow EMS' appeal, which was based on an untimely notice of claim.

We considered this issue in the context of an appeal from a State bid protest in *Kennedy Temporaries v. Comptroller of the Treasury*, 57 Md.App. 22, 468 A.2d 1026 (1984). (Bid protests and claims follow the same four part administrative process.) See Md.Code Ann. State Fin. & Proc. § 15–215 *et seq.* See also *McLean Contracting Co. v. Maryland Transportation Auth.*, 70 Md.App. 514, 523, 521 A.2d 1251 (1987)(the dispute must be submitted to the agency procurement officer for resolution; the agency head may approve, disapprove, or modify the procurement officer's decision; the agency head's decision may be appealed to the Board; and, the Board's decision is subject to judicial review under the Administrative Procedure Act). In *Kennedy* we held that an untimely protest does not trigger the statutory dispute resolution process and that an appeal to the Board from an untimely protest must be dismissed, even if the procurement officer had taken cognizance of the complaint and considered it on its merits. *Kennedy Temporaries*, 57 Md.App. at 40, 468 A.2d 1026. EMS' argument that the *Kennedy Temporaries* case is "now-dated" because it "applied the pre-revision version of Maryland procurement laws" is incorrect. Neither the time requirements nor our holding in the *Kennedy Temporaries* case was altered by statutory revisions made in 1986 and 1988.

Finally, EMS argues that the Board's dismissal of its appeal was improper because "SHA had plenty of notice about the effect of the OSHA regulations on EMS and other such contractors, and EMS' need for more time and more money to complete the work." The purpose of the notice of claim is to trigger the statutory dispute resolution process. Section 15–217(a)(2) of the State Finance and Procurement article specifically provides that "[a] person who has been awarded a procurement contract may submit a claim to the procurement officer." There is no provision for imputed notice. Accordingly, EMS' contention that "SHA is hard-pressed to deny knowledge of the impact of the new OSHA regulations

on the performance of a bridge cleaning and painting contract" because two other contractors requested and received additional compensation, is without merit. Equally disingenuous is EMS' contention that "if SHA insists upon a standard whereby 'constructive notice' constitutes sufficient 'notice,' then the SHA must stand or fall according to the same standard." SHA's knowledge, acquired from other contractors, simply does not suffice for timely written notice from EMS. The procedural purpose of the notice requirement is to trigger the statutory dispute resolution process. EMS failed to provide a timely notice of claim and thereby failed to trigger that process.

**JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.**